DECISION
This civil action is the petitioner's motion, pursuant toG.L. 1956 (1986 Reenactment) § 28-9-18, to vacate an arbitration award. After not having satisfactorily resolved its grievance against the Department of Children, Youth and Their Families (hereinafter referred to as "the State") arising out of the assignment of social caseworkers to the position of case monitor, the respondent union brought its dispute to arbitration on September 21, 1993. After hearings on three dates in 1994 and receipt of briefs, the arbitrator issued his award against the State on March 8, 1995, in American Arbitration Association, Labor Arbitration Tribunal, Case No. 10-390-00358-93. On June 6, 1995 the State fled this motion to vacate the award and a motion to stay implementation of the award pending decision on its motion to vacate. The motion to stay was heard and granted on July 19, 1995. Briefing on the merits was concluded on September 1, 1995.
FACTUAL BACKGROUND
The facts which gave rise to this grievance, arbitration, and litigation are not disputed. The best place to begin is with an agreement between the parties entered into on October 7, 1980. That agreement, sometimes called the caseload agreement, was entered into pursuant to Article VII of the Collective Bargaining Agreement between the parties, which provided generally for an equitable and fair distribution of work loads among employees in the bargaining unit. The caseload agreement was obviously designed to implement that general requirement of equity and fairness. The pertinent paragraph of the 1980 caseload agreement reads as follows:
 "The maximum number of cases to be carried by a caseworker in Direct Services shall be 35 children. The Department shall make every effort to attain a caseload of 30 children per worker. If after expending every effort to reach the caseload limit of 30 children per worker said efforts are not successful, the caseload limit shall be 40 children per worker."
The difficulty the State had in complying with this agreement, including this provision, became the subject of four prior arbitration proceedings, all of which resulted in awards against the State, of which more later. It is undisputed that by the time this grievance arose, the maximum caseload limit had been reduced by agreement to 28 children per caseworker.
On July 23, 1992, while the maximum caseload for caseworkers in Direct Services in the Department was 28 children, the State posted notice of a vacancy in the position of Social Caseworker II in a case monitoring unit. On July 27, 1992, the union grieved the posting on the grounds it violated section 28.1 of the Collective Bargaining Agreement pertaining to monitoring of employees and because no caseload limit had been set for this position. Sometime later, further vacancy notices were posted for other vacancies in the same position, and eventually, in 1993, two Social Caseworkers II and one Casework Supervisor II, all represented by the union, were assigned to positions in the unit. In the meantime, on February 2, 1993, the union renewed its earlier grievance and requested an internal hearing. The grievance was denied on August 3, 1993, by a hearing officer in the office of labor relations in the State Department of Administration. Arbitration ensued.
THE ARBITRATION AWARD
The arbitrator adopted the union's formulation of the issues to be resolved: "Did the State violate the contract and/or the Caseloads Agreement in the implementation of the so-called case monitoring job assignment? If so, what shall be the remedy." Although the parties disagreed slightly on the formulation of the violation question, they did agree that the question of an appropriate remedy for any violation would be submitted to the arbitrator.
The arbitrator found that creation of new positions in the case monitoring unit without notice to the union violated Section 1.2 of Article 1 of the Collective Bargaining Agreement. That section provides: "The Union shall be notified within ten (10) working days of the authorization of each new position in and the pay plan for that new position within the [Department]." The positions were clearly new. The union was never notified of the authorization of these positions. The State does not argue here that this conclusion of the arbitrator was irrational.
He further found that the State had violated Section 11.9 of Article 11, Seniority, of the Collective Bargaining Agreement, when it did not consult with the union on procedures to be followed to reduce adverse effects from a realignment of work force. Section 11.9 reads as follows:
 "While the impact of realignment of work forces or technological change may not result in a reduction in force, the State and the Union recognize that employees may be adversely affected by such changes. Therefore, the State agrees to fully consult with the Union prior to implementation on procedures to be followed in reducing these adverse effects."
The arbitrator concluded that assigning members of the bargaining unit to newly-created positions in a newly-created unit with a different caseload, both in number and difficulty from those left to caseworkers in the "generic" unit, constituted a "realignment of the work force." That conclusion is virtually self-evident, and the plaintiff wisely does not contest it in this case.
Furthermore, the arbitrator did find that this unconsulted realignment of the work force did in fact cause adverse effects on members of the bargaining unit. Specifically, the arbitrator found that, "Generic case workers are bearing the brunt of increased intensity in their caseloads as a result of the skimming off of the `stabilized' cases to the Monitoring Unit." The State can scarcely object to this finding, because, based on the evidence presented by the State, just such a skimming off of stabilized cases was the very purpose of the creation of the unit. The arbitrator accepted evidence which proved that while "each Generic caseworker who previously had 28 cases ranging in intensity from one through ten (on a ten scale) now has, still, 28 cases but they range in intensity from 5 through 10."
The arbitrator found that the State was violating Section 7.1 of the Collective Bargaining Agreement by assigning social caseworkers in the Direct Services division of the department more cases than permitted in the caseload agreement. Section 7.1 of the collective bargaining agreement provides simply:
 "Work load will be distributed equitably and fairly among employees in the bargaining unit."
As has been pointed out, a caseload limit has been established in the caseload agreement for all caseworkers in the Direct Service division since 1980. The caseloads of the caseworkers in the case monitoring unit in the Direct Service division was found to be in the range of 40 cases per month as of February 1994. The arbitrator concluded from the evidence that "the caseloads of the present Monitoring Unit caseworkers are excessive and are susceptible to examination and adjustment under Article 7." The caseload agreement expressly provides for arbitration of disputes with respect to its interpretation, application, or violation.
REVIEW OF THE AWARD The Case Monitoring Unit. Although the State does not press any argument on this motion that it did not violate the collective bargaining agreement when it failed to notify and consult with the Union prior to assigning any caseworkers to the case monitoring unit, it does contend that it was under no obligation to negotiate a special caseload limit for those employees nor to take any action whatever to relieve the generic caseworker from the adverse impact of the realignment of work forces. It is simply incredible that the State honestly believed it could unilaterally establish a caseload in excess of 28 for any member of the bargaining unit, whatever his or her assignment, respective of how hard or how easy the cases in the caseload may be.
We must now revisit an awesome arbitration history reflecting a determined effort by a department of state government to renege on its promises. On March 23, 1984, the State was found to have violated the caseload agreement since June 1983 regarding the caseload limits for caseworkers in the Division of Assessment and Emergency Response and was ordered to comply within 30 days. On June 26, 1985, the State agreed that it had violated the same provisions between April 22, 1984, and February 28, 1985, and submitted to an award that granted affected employees time off with pay and benefits for one week not chargeable to leave. On May 8, 1986, the State was found to have violated the caseload limit in the Division of Direct Services since December 1, 1984. The State was ordered to compensate each affected employee each month 1/35th of the employee's current salary multiplied by the number of cases assigned over 35, then the pertinent case limit, and for each month since May 1, 1985, a like amount multiplied by the number of cases in excess of 30, less any amount received for an excess over 35. This award is referred to by the parties asDorr I. On August 20, 1991 the State was found to have violated the caseload agreement since June 1988. The State was ordered to compensate affected employees in accordance with the formula established in the 1986 award. This award, referred to as DorrII, was confirmed by this Court on December 17, 1992. On September 14, 1992, the State was found to have violated the caseload agreement with respect to the supervisory load of casework supervisors. The Dorr-type remedy imposed by the arbitrator on October 27, 1994, was confirmed by this Court on May 31, 1995.
Although the arbitrator was tactful not to say so, it is obvious that the case monitoring assignment was simply another stratagem by a fiscally straitened department to avoid the economic burden of a costly collective bargaining agreement. Seen in this light, the reason for the failure to notify and consult with the union becomes clear. The State was aware that it was obligated under its agreement to negotiate caseloads with its social caseworkers and casework supervisors. Otherwise, the 28-case limit would apply. Perhaps, if it had negotiated special caseload limits for this unit, in accordance with the Collective Bargaining Agreement and the caseload agreement, a limit greater than 28 cases might have been reached by agreement. The Court is unable to understand the State's objection to so much of the award as orders it to begin to bargain caseloads for the case monitoring unit and to hire new workers, if needed, to handle any excess. The arbitrator could, after all, have found the 28-case limit to apply, ordered a Dorr-type compensation award and ordered the caseloads reduced forthwith. The award of Dorr-type compensation for over-loaded social caseworkers has been acceded to by the State in the past on one occasion and has been afterward confirmed by two justices of this Court, without appeal by the State.
As a consequence, the remedy awarded for over-loading social caseworkers along the lines of the so-called second Dorr award is both rational and securely based on the collective bargaining agreement as well as the well-established law of this workplace.
The "Generic" Caseworkers. The award with respect to generic caseworkers requires a different analysis, even though the arbitrator chose to treat all of these workers as more or less fungible. The collective bargaining agreement and the caseload agreement have not been violated in terms of purely quantitative analysis. No generic social caseworker has been shown to have a caseload of more than 28. The arbitrator did, however, find that the State had violated the fair and equitable distribution of the workload provision in paragraph 7.1 of the Collective Bargaining Agreement and the consultation provision of paragraph 12.9 of the agreement. He found that generic caseworkers had been overloaded by having the "easier" cases "skimmed off" into the caseloads of the case monitoring caseworkers. This was just the kind of adverse effect the parties were supposed to consult about.
The State argues that the agreement requires them only to consult and not to negotiate, much less come to agreement as to how to relieve those adverse impacts. Accordingly, it says the only remedy to which it is subject is an order to consult with the Union. In cannot be compelled, it says, to apply any particular relief in the form of compensation to adversely affected workers, as ordered by the arbitrator, nor to negotiate caseloads for those workers, much less to hire additional workers. The State contends that by applying remedies not specifically provided in the agreement the arbitrator is re-writing the agreement.
The State points to the decision of our Supreme Court in Townof Coventry v. Turco, 574 A.2d 143 (R.I. 1990) as guidance in deciding whether this arbitrator has so manifestly disregarded contractual provisions that his award cannot be sad to be based on a passably plausible interpretation of the contract, and so "re-writes" the agreement. In that case the question arbitrated was whether or not a one-time lump-sum accumulated sick leave benefit payment made at retirement should be included in a retiree's base pay for pension calculation purposes under a collective bargaining agreement. The arbitrators concluded that the lump-sum cumulative payment was like other negotiated benefits which were included in the computation of base pay, although the agreement itself was silent as to what was included in base pay. There were two different kinds of lump-sum sick leave payment provisions in the agreement. One provided reimbursement at a reduced rate for sick-leave days accumulated each year in excess of 180 to be included in the employee's December pay period. That reimbursement was included in base pay for pension computation by the town. The other was the one-time payment for accrued but unpaid sick leave for up to 120 days payable once at retirement. The Supreme Court held that to include the second category, which was so distinct from the first by reason of their different recurrence, would be to "re-write the agreement," although neither benefit was mentioned by the agreement as part of base pay.
The Court clearly concluded that base pay could rationally include only those elements of compensation which are regularly paid and earned over a period of time, but cannot include one-time lump-sum benefits accrued over time but paid once only at retirement. That being so, the arbitrators were clearly irrational and had reached a result in disregard of the contract. The result in that case so plainly depends on the particular language of the agreement, on which the arbitration was based, it cannot have any analogy to the case here in dispute. Furthermore, the employer in the Turco case did not concede, as it does here, that it had violated the agreement, whereas here all that is at stake is how to remedy the harm done by an acknowledged violation.
The arbitrator did not modify or re-write this agreement. He did, nevertheless, give it a decidedly one-sided pro-union interpretation. That is a risk of the arbitration process. There exist a good many much more balanced and even handed interpretations of these notification and consultation requirements, but there is no legal requirement that arbitrators' decisions be balanced or even handed. This Court is not permitted to substitute its judgment for that of the arbitrator so long as the arbitrator's award is rational and draws its essence from the Collective Bargaining Agreement. See United Paper Workers v.Misco, Inc., 484 U.S. 29, 37-38, 108 S.Ct 364, 370-71, 8 L.Ed 2d 286 (1987).
Since the State chose unilaterally not to consult the union regarding the impact of the adverse effects of a more intense caseload, thereby opening the door to negotiate, it was left to the arbitrator under the terms of the Collective Bargaining Agreement to frame a remedy for those adverse effects. The State could have negotiated new caseloads or compensatory incentives for the qualitatively over-loaded social caseworkers in the generic unit as it could have bargained changes for the quantitatively over-loaded social caseworkers in the case monitoring unit. Having failed to comply with the consultation provision before it re-adjusted these caseloads, it may not now avoid the consequences of that failure. The remedy rationally addresses the violation and draws its essence from the Collective Bargaining Agreement and the history of non-compliance by the State with a resulting enforcement by arbitration award.
The award is confirmed. The motion to vacate the award is denied. The stay heretofore entered is vacated.